**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **ALEXANDER MINNEHAN,**<br>Plaintiff,<br>**v.**<br><br>**ALLISON SEPECZI,**<br>**MOLLIE BOOKIE, and**<br>**CHLOE VANSINGEL,**<br>Defendants. | **CASE NO.: 26-cv-2227**<br><br>**Hon.: Robert J. Jonker** |

Collin H. Nyeholt (P74132)
LAW OFFICES OF CASEY D.
CONKLIN, PLC
4780 Okemos Road, Ste 2
Okemos, MI 48864
(517) 522-2550
collin@caseydconklin.com

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT BOOKIE'S MOTION TO DISMISS**

NOW COMES the Plaintiff, Alex Minnehan who, through counsel, states the following argument in opposition to Defendant Mollie Bookie's Motion to Dismiss, RE 7.

## FACTS

Alex Minehan had no history of anxiety, depression, PTSD, or any mental illness of any kind whatsoever before the night of August 17, 2025.[1] Because of what happened that night, he has been diagnosed with both acute post-traumatic stress disorder and adjustment disorder

[1] Comp, RE 1, ¶ 35.

stemming from this single, identifiable incident.[2] Ever since, he has had ongoing panic attacks, depression, social paranoia, racing thoughts, restlessness, low motivation, loss of interest in social and pleasurable activities due to anxiety, and sleeplessness and nightmares.[3] All of this has caused him, for the first time in his life, to have to rely upon psychological medication.[4] He has incurred, and will continue to incur, medical expenses for the treatment of the condition that this has caused.[5] From a medical standpoint, the events of August 17th have been every bit as impactful, long lasting, and costly as a serious physical injury.

How did we get here?

Alex Minehan was a student at Calvin College in Grand Rapids.[6] In March of 2024, he socialized with Defendant Sepeczi online and went on several dates with her, but he never agreed that he and she would be exclusive.[7] She responded poorly to his rebuff, and he eventually had to "block" her from texts, social media, and other communication methods because of her misbehavior.[8] Until the events described to follow, Mr. Minnehan had *thought* that he was friends with Defendant VanSingel, but the two never dated or were romantically involved in any way.[9] He had, on one occasion dated Defendant Bookie, but never indicated that he and she were in any form of a long-term, committed, or romantic relationship.[10]

---

[2] *Id.* at ¶ 36; *See also* **Ex. A,** Medical Records Excerpt. **Note:** since these medical records are "referred to in the complaint and central to the claims contained therein," the Court may consider them while deciding Defendant Bookie's 12(b)(6) motion and without converting same to a Rule 56(c) challenge per *Bassett v. Nat'l Collegiate Athl. Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008).
[3] **Ex A**.
[4] Comp, RE 1, ¶ 37; **Ex. A.**
[5] Comp, RE 1, ¶ 38.
[6] *Id* at ¶ 10.
[7] *Id.* at ¶ 11-13.
[8] *Id.* at ¶ 13.
[9] *Id.* at ¶ 16.
[10] *Id.* at ¶ 15.

Little did Mr. Minnehan know, but Defendant Sepeczi had launched into a vengeful, organized, and ongoing scheme to cause him extreme emotional distress and irreparable damage to his reputation.[11] Defendant Bookie and Vansingel, as described to follow, chose to participate with her.

Mr. Minnehan returned to school in Grand Rapids in August of 2025.[12] On August 17th, Defendant Vansingel sent him a text message inviting him to a supposed "back to school party" at her apartment.[13] He would learn very quickly that this was a rouse, and that it was really the intention of the three Defendants to lure him to the apartment for the purposes of "ambushing" him as described to follow.[14]

When he arrived, Mr. Minnehan observed multiple individuals in VanSingel's apartment including a heavyset male, a thinner male with a scruffy beard, and a heavyset female, none of whom he had met before or recognized.[15] When he walked into the living room area of the apartment, he found VanSingel, Sepeczi, and Bookie all wearing coordinated black dresses.[16] The three of them began screaming expletives at him, accusing him of being a "cheater" and a "whore."[17] During this confrontation, the Defendants confronted Minnehan with several printouts

---

[11] *Id.* at ¶ 14.
[12] *Id.* at ¶ 17.
[13] *Id.* at ¶ 18; *See also* Van Singel Answer, RE 8, ¶ 18 (admitting same).
[14] *Id.* at ¶ 33. **Note:** From the limited record that has developed so far, this allegation appears to have been completely correct. Defendant VanSingel herself "admits that she lured Plaintiff to her apartment" and "admits that she asked Plaintiff over to her apartment with the intention of confronting him over his conduct with Sepeczi and Bookie[.]" VanSingel Answer, RE 8, ¶¶ 33, 48.
[15] Comp., RE 1 at ¶ 19.
[16] *Id.* at ¶ 20.
[17] *Id.* **Note:** Here again, the record already tends to support this allegation. Defendant Van Singel "admits that there was a confrontation with Plaintiff because Defendant Bookie and Defendant Sepeczi stated that they discovered Plaintiff was dating both women at the same time." VanSingel Answer, RE 8, ¶ 20.

from various social media exchanges he had had with them.[18] They caused all of this to be video recorded.[19] Sepeczi later posted this recording on the social media website TikTok.[20]

The Defendants' TikTok video is "referred to in the complaint and central to the claims contained therein," and therefore the Court may review it in deciding this 12(b)(6) motion.[21] Screenshots from same will therefore be admitted as **Exhibit B** to this pleading and the recording itself will be submitted to the Court pursuant to Administrative Order 25-MS-054 as **Exhibit C**. At approximately 16 seconds, the language "#catchcheater," "#besafe," "#girlsstickingtogether," and "#alexminnehan" and "Calvinuniversity" appear on screen.[22] At 20 second, a female voice is heard that says "you really didn't think we'd find out?" Mr. Minnehan responds "find out what?" She responds "that you're a whore!" Throughout the video, there are visual flashes to the supposed "evidence" and various commentary. At approximately 31 seconds, two photographs appear on the screen. One is a photograph of Mr. Minnehan and it is captioned "the menace." The other is a photograph of Sepeczi, VanSingel, and Bookie, all posed together in their matching black dresses, and it is captioned "the girls." This is not exactly a Richard Posner brief, but the Defendants' message is quite clear: the video asserts that Alex Minnehan is a "whore," because he was "caught

---

[18] Comp, RE 1 at ¶ 20. **Note:** Here again, Plaintiff's assertion in this respect appears to be accurate; VanSingel avers that "Defendant Bookie and Defendant Sepeczi supported their claims with information including what was in the alleged 'printouts.'" VanSingel Answer, RE 8, ¶20.

[19] Comp., RE 1 at ¶ 20.

[20] Comp., RE 1 at ¶¶ 23, 24.

[21] *Bassett*, 528 F.3d at 430.

[22] For those, like the undersigned, who were born in the 1900's it may be helpful to note that the symbol "#" is what is referred to in social media parlance as a "hashtag." This is a distinct identifier used in social media items like this that causes it to be grouped, searched, and found with other similar items. Using the "hashtag" "#Alexminnehan" would cause the video to more likely be found by anyone searching his name in an online search. And using the hashtag "#calvinuniversity" would cause this video to be me likely encountered by anyone searching for Calvin University. In other words, this was a specific act designed to cause this video to come to the attention not just of Minnehan's friends, but anyone at his school. *See:* Comp, RE 1, ¶ 23 (noting that these # markings "would cause this video to be shown to persons at Plaintiffs home city and college" and "[a]ll of this was intended to cause maximum adverse impact to Plaintiff's reputation and emotional state."

cheating" by dating "the girls" (Allison Sepeczi, Chloe Vansingel, and Mollie Bookie) all at the same time.

The video ended up receiving over 1,000 views on TikTok and dozens of comments.[23] In the months since, Plaintiff has had people raise concerns about Sepeczi's ongoing misstatements, including this one, and have cited it as a reason to discontinue social contact with him.[24]

Unfortunately, The August 17th incident didn't end with the video. After the recording was done, Mr. Minnehan stated that he wanted to leave. Defendant VanSingel told him: "***you can't leave; these guys will do something to your car if you do.***"[25] Plaintiff was then forced into a back room with VanSingel who proceed to berate him for several minutes about how he needed to "reevaluate his life choices."[26]

After VanSingel finished her harangue, and finally allowed him to leave, Mr. Minnehan was quite shaken and in a state of profound emotional distress.[27] He began sweating profusely and experienced shortness of breath and acute chest pain.[28] At 4:20 AM, he was released after it was confirmed that this was a panic attack, as opposed to a more severe cardiac event.[29] He has had ongoing symptoms and has been diagnosed with acute post-traumatic stress disorder and adjustment disorder, all related to the events described above.[30]

---

[23] Comp, RE 1, ¶ 25.
[24] *Id.* at ¶ 31.
[25] Comp, RE 1, ¶ 21.
[26] *Id.*.
[27] Comp, RE 1, ¶ 22.
[28] *Id.*; *See also* **Ex. A –** Medical Records Excerpt.
[29] Comp, RE 1, ¶ 22.
[30] *Id.* at ¶ 36; *See also* **Ex. A,** Counseling Records Excerpt per *Bassett*, 528 F.3d at 430.

## ARGUMENT

### I. Standard of Review.

Defendant Bookie's motion to dismiss is based upon Federal Rule of Civil Procedure 12(b)(6) which permits dismissal if the Complaint "fail[s] to state a claim upon which relief can be granted." Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive, the complaint must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."[31] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[32] At this stage, the court should "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."[33] The complaint passes muster if it "contain[s] either direct ***or inferential*** allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory."[34]

### II. "<u>#girlsstickingtogether:</u>" Bookie, VanSingel and Sepeczi Engaged in a Civil Conspiracy in Violation of Michigan Law.

Defendants Bookie, Sepeczi, and VanSingel together engaged in a coordinated effort that was intended and designed to cause significant damage to Mr. Minehan's reputation and result in significant emotional distress. It worked. Their actions amounted to false imprisonment,

---

[31] *Handy–Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, , 550 U.S. 544, 555 (2007)).
[32] *Bickerstaff v Lucarelli*, 830 F3d 388, 396 (CA 6, 2016) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).
[33] *Bickerstaff,* 830 F3d at 396 (*quoting Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).
[34] *Bickerstaff,* 830 F3d at 396 (*quoting Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007) (emphasis added)).

defamation, and intentional infliction of emotional distress under Michigan law. They are each liable for the resulting damages because Michigan recognizes civil conspiracy as a basis to impose tort liability.

Mr. Minnehan is domiciled in New York while Bookie, VanSingel, and Sepeczi are not.[35] This is therefore a diversity case pursuant to 28 USC § 1332. "[F]ederal courts sitting in diversity apply the substantive law of the forum state and federal procedural law."[36] This suit was filed in Michigan, and the underlying events occurred in Michigan. Michigan substantive law and federal procedural law will therefore govern this dispute.[37]

In Michigan, "[a] civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means."[38] "All those who, in pursuance of a common plan to commit a tortious act, actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with him."[39] Once a civil conspiracy is established, "whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein or the extent to which they benefited thereby."[40] And "where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable."[41]

---

[35] Comp, RE 1, ¶¶ 2, 3, 4, 5.
[36] *Biegas v. Quickway Carriers*, 573 F.3d 365, 374 (6th Cir. 2009) (citations omitted).
[37] *Id.*
[38] *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313 (1992).
[39] *Rosenberg v Rosenberg Bros Special Account*, 134 Mich App 342, 354 (1984) (quoting William L. Prosser, *Handbook of the Law of Torts* §46, at 292 (4th ed 1971)).
[40] *Brown v Brown*, 338 Mich 492, 503, 61 NW2d 656 (1953), *cert denied,* 348 US 816 (1954) (quoting *Warsop v Cole*, 292 Mich 628 (1940)).
[41] William L. Prosser, *Prosser and Keeton on the Law of Torts* §46, at 324 (W. Page Keeton ed, 5th ed 1984) (footnotes omitted).

**a. Pleading Standard – Civil Conspiracy.**

Since this is a 12(b)(6) motion, we are concerned with the sufficiency of the pleadings. As we shall see, Mr. Minnehan's complaint has laid out a compelling claim of civil conspiracy between Defendants Bookie, Sepeczi, and VanSingel to commit tortious acts towards him.

First, it is improper to plead civil conspiracy as a discrete, standalone count in the complaint. "An allegation of conspiracy, standing alone, is not actionable" our Court of Appeals has cautioned.[42] Instead, "a claim of civil conspiracy must be based on an underlying actionable tort."[43] The courts of this state routinely dismiss a civil conspiracy claims that are disembodied from an underlying tort.[44] Pleading a standalone count of "civil conspiracy," then, is improper. To properly plead civil conspiracy, the plaintiff must identify specific, actionable torts and then plead allegations in support of civil conspiracy between the participants to the tort. This is what Plaintiff has done here.[45]

---

[42] *Magid v Oak Park Racquet Club Assocs*, 84 Mich App 522, 529 (1978) (citing *Roche v Blair*, 305 Mich 608, 614–616 (1943)).
[43] *Levitt v. Bloem*, 2019 WL 2194568 (MI Ct. of App. 2019) (citing *Advocacy Org. v. Auto Club Ins.*, 257 Mich.App. 365, 384-85 (2003).
[44] *Knight v Wheeler*, No 93-CV-75053-DT (ED Mich Mar 8, 1995) (civil conspiracy claim may not be maintained if there is no underlying substantive theory of liability); *Roseville Plaza Ltd Partnership v United States Gypsum Co*, 811 F Supp 1200, 1213 (ED Mich 1992) ("plaintiff's conspiracy allegations, which are not attached to allegations of a substantive wrong, are not actionable"), *aff'd,* 31 F3d 397 (6th Cir 1994); *Early Detection Ctr, PC v New York Life Ins Co*, 157 Mich App 618, 632 (1986) ("since plaintiffs have failed to state any actionable tort theories in their proposed amended complaint, the conspiracy theory must also fail"); *Cousineau v Ford Motor Co*, 140 Mich App 19, 37, *cert denied,* 474 US 971 (1985) (claim that defendants conspired to act in concert lacked meaning without underlying tortious or criminal activity); *Magid v Oak Park Racquet Club Assocs*, 84 Mich App 522, 529 (1978) (allegation of conspiracy alone is not actionable; it must be accompanied by allegation of civil wrong resulting in damages to plaintiff).
[45] Comp, RE 1, ¶¶ 20, 23, 33, 40, 48, 57.

Second, to establish civil conspiracy liability at the pleadings stage, a plaintiff need not specify the exact means used to carry out the illegal purpose.[46] Proof of a conspiracy is normally circumstantial.[47] And while conspiracy may not be assumed,[48] a claim may be sustained if the evidence of conspiracy "support[s] a reasonable inference that two or more persons planned or acted in concert to accomplish an unlawful end."[49] As the Court of Appeals stated in *Temborius v Slatkin*,

> [t]he agreement, or preconceived plan, to do the unlawful act is the thing which must be proved. Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. ***It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact***. Furthermore, conspiracy may be established by circumstantial evidence and may be based on inference.[50]

It could be argued that the applicable pleadings standard is not a *substantive* question to which this Court should defer to Michigan law, but a *procedural* question to which the Court should look to federal precedent. But this is a nonissue because federal law agrees with Michigan law in relevant respects. The Sixth Circuit has held, in deciding an analogous claim of civil conspiracy under federal law, that

> Plaintiffs need not prove an express agreement among the conspirators, nor must they show that each conspirator knew all of the details of the illegal plan or all of the participants involved. ***In order to survive summary judgment, plaintiffs asserting a civil conspiracy can rely on circumstantial evidence to establish an agreement among the conspirators***, as long as the conspiracy claims are pled with some degree of specificity and do not rely on vague and conclusory allegations.

[46] *Goldsmith v Moskowitz*, 74 Mich App 506, 521 (1977).
[47] *Bahr v Miller Bros Creamery*, 365 Mich 415, 421 (1961).
[48] *Harvey v Lewis*, 357 Mich 305, 311 (1959)
[49] *Rencsok v Rencsok*, 46 Mich App 250, 252 (1973) (citations omitted)
[50] 157 Mich App 587, 600 (1986) (emphasis added).

Whether we look to the Michigan Court of Appeals or the Sixth Circuit for the standard, the rule remains consistent: at the pleadings stage, one may show a civil conspiracy through the circumstances, acts and conduct of the parties.

Defendant Bookie argues that "[t]he Complaint alleges no specific communication, agreement, defamatory statement, threat, restraint, publication-related act, or extreme and outrageous conduct by Bookie."[51] She similarly argues that the complaint "impermissibly reli[es] upon group pleading."[52] But the Michigan Court of Appeals has rejected similar challenges to civil conspiracy claims. In *Goldstein v. Moskowitz*, the Michigan Court of Appeals rejected a nearly identical position to the one Bookie now advances.[53] The Goldsteins had alleged that the Moskowitz had sold them land that they did not own in Arizona. The Goldsteins further alleged that the co-defendants, lenders and title agents committed civil conspiracy because they were aware of the Moskowitz' illegal purpose and allowed it to happen through their involvement in the transaction. But, as is common with civil conspiracy claims, they were not able to point to any specific statements or agreements between the Moskowitz and the title agents and relied primarily upon the circumstances of the transaction and so relied upon the circumstances. The trial court was troubled by the fact that the complaint "did not state the circumstances constituting fraud with sufficient particularity" and therefore "granted the motion for summary judgment."[54] The Court of Appeals found this to be error because ***"[i]n alleging conspiracy, one need not specify the exact means used in carrying out the illegal purpose***" and found the complaint to be sufficient because it alleged generally, that "[t]he illegal purpose on behalf of all defendants, except the bank, was claimed to be to obtain title to plaintiffs' valuable property by misrepresentation and deceit,

---

[51] Brief, RE 7-1, PageID 30.
[52] *Id.* at PageID 32-33.
[53] 74 Mich.App. at 521.
[54] *Id.* at 511.

according to a scheme alleged, the allegation of damages is self-evident in the pleadings whereas once plaintiffs owned valuable property, as a result of the claimed fraudulent actions of defendants, they have lost their properties to their damage."[55] In other words, in Michigan one may rely upon circumstances to show a civil conspiracy and acquiescence in the conspiracy may be alleged with generality in consideration of the circumstances. By demanding a level of detail in the pleadings that the law does not require, Defendant Bookie asks this court to commit the same error that the trial court did in *Goldsmith*.

In summary, at the pleadings stage Plaintiff may rely upon *circumstantial evidence* including circumstances, acts and conduct of the parties establish the agreement in fact necessary to impose liability for an underlying, actionable tort. The pleadings pass muster if they support a reasonable inference that two or more persons planned or acted in concert to accomplish an actionable tort. Here, and as discussed to follow, Plaintiff has shown that Defendants Sepeczi, Van Singel, and Bookie conspired together to commit false imprisonment, defamation, and intentional infliction of emotional distress ("IIED") against him.

**b. False Imprisonment.**

False imprisonment is the unlawful restraint of a person's liberty or freedom of movement. This restraint must be "false," in that it was done without right or authority to do so.[56] In *Tumbarella*, the Michigan Court of Appeals found that this did not require physical restraint, but was satisfied through "menacing gestures" coupled with "threats" which "expressly or impliedly restricted plaintiff's freedom."[57] And in *Clark v. Kmart Corporation*[58] the Michigan Court of Appeals concluded that a store owner's detaining a customer's merchandise, valued in excess of

[55] *Id.* at 521.
[56] *Tumbarella v Kroger Co,* 85 Mich App 482, 489 (1978).
[57] *Id.*
[58] 197 Mich.App. 541 (1992).

$250, without any restraint to her *person* was sufficient to state a claim for false imprisonment. In other words, in Michigan law, where one's freedom of movement is restricted through actual or implied threats to their person or to their valuable property, they have stated a claim for false imprisonment.

As alleged in the Complaint, "on August 17th, 2025, Defendants Sepeczi, VanSingel and Bookie conspired with currently unknown persons to lure Plaintiff to VanSingel's apartment under false pretenses. Once there, they prevented him from leaving by threatening him with damage to his vehicle."[59] Indeed, he attempted to leave and when he did, VanSingel told him, "***You can't leave; these guys will do something to your car if you do.***"[60] The actual threat of damage to Minnehan's car, and the *implied* threat of violence to him given the situation, is sufficient to substantiate a claim of false imprisonment in Michigan law.

It can reasonably be inferred, given the circumstances, acts, and conduct of the parties that VanSingel, Sepeczi, and Bookie coordinated together to falsely imprison Mr. Minnehan on August 17, 2025. Sepeczi, VanSingel, and Bookie wearing coordinated dresses and posed together for the "the girls" photo that was eventually used in the video.[61] And they were ready with printouts from social media as supposed "evidence" of his "whoring" behavior.[62] They had multiple others on

---

[59] Comp, RE 1, ¶ 48. Again, this allegation appears to be 100% correct; Defendant VanSingel herself "admits that she lured Plaintiff to her apartment" and "admits that she asked Plaintiff over to her apartment with the intention of confronting him over his conduct with Sepeczi and Bookie[.]" VanSingel Answer, RE 8, ¶¶ 33, 48.

[60] Comp, RE 1, ¶ 21.

[61] Comp, RE 1, ¶¶ 19, 20; **Ex B –** "The Girls" photograph of Sepeczi, VanSingel, and Bookie posed together.

[62] Comp, RE 1, ¶ 20. **Note:** Here again, this allegation appears to be correct. VanSingel has admitted to the Court that "Defendant Bookie and Defendant Sepeczi stated that they discovered Plaintiff was dating both women at the same time" and they "supported their claim with information including what was in the alleged 'printouts.'" VanSingel Ans, RE 8, ¶ 20.

hand so that he was outnumbered and overpowered.[63] VanSingel offered her apartment for this, and she lured Plaintiff there under false pretenses.[64]

All told, the circumstances allow one to infer the Sepeczi, VanSingel, and Bookie coordinated together to cause Plaintiff to be held at VanSingel's apartment, under threat of damage to his car, for an appreciable period of time.

**c. Defamation.**

In Michigan, the elements of a defamation claim are (1) a false and defamatory statement regarding the plaintiff, (2) a communication to a third party that is not privileged, (3) fault on the part of the publisher that amounts to at least negligence, and (4) either special harm caused by the publication or actionability of the statement regardless of special harm, otherwise known as defamation per se.[65] By Michigan statute, "words imputing lack of chastity to any female or male are actionable in themselves and subject the person who uttered or published them to a civil action for slander in the same manner as the uttering or publishing of words imputing the commission of a criminal offense."[66] As Plaintiff alleges, each of the Defendants "have knowingly and intentionally accused Plaintiff of 'cheating' on them, and being a 'slut' and a 'whore' by engaging in untoward sexual behaviors while in a committed relationship with them. These statements were knowingly and intentionally false or made with reckless indifference to the truth."[67] Indeed, the TikTok video they created together stated as much.[68] Sepeczi, VanSingel, and Bookie dressed

[63] Comp., RE 1 at ¶ 19.
[64] *Id.* at ¶ 48.
[65] *Cetera v Mileto,* 342 Mich App 441, 449 (2022); *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 113 (2010).
[66] MCL 600.2911(1); *See also Burden v. Elias Bros.,* 240 Mich.App. 723, 728 (2000) "MCL 600.2911(1) is the codification of the common-law principle that words imputing lack of chastity or the commission of a crime constitute *defamation per se* and are actionable even in the absence of an ability to prove actual or special damages."
[67] Comp, RE 1, ¶ 40.
[68] **Ex. B, Ex C.**

identically and posed together, representing that they were "the girls" who had been "cheated on" by this "menace" and "whore," Plaintiff Alex Minnehan.[69] It is not of much controversy that all of this would amount to defamation per se in violation of Michigan law.

It can reasonably be inferred, given the circumstances, acts, and conduct of VanSingel, Sepeczi, and Bookie that they coordinated together to defame Mr. Minnehan. VanSingel lured Plaintiff to her apartment on the night of August 17, 2025, under false pretenses.[70] Once there, VanSingel, Sepeczi, and Bookie accused him of being a "whore" who had been "caught cheating" by dating all three of them at the same time, videotaped the encounter, and then later published the recording online for the world to see.[71] They had printed out supposed "evidence" of this "cheating." They wore matching outfits as a show of solidarity in this act and they posed together for a picture used in the video identifying them as "the girls" who had been "cheated on" by this "menace" and "whore," Mr. Minnehan.[72] In light of all of this, Mr. Minnehan has alleged that "Defendants Bookie and VanSingel knew it was Sepeczi's intention to post this video publicly in an attempt to damage Plaintiff's reputation and cause him extreme embarrassment and emotional distress" and that they "approved, ratified, and participated in this action on Sepeczi's part."[73] The facts and underlying circumstances support this allegation.

---

[69] *Id.*

[70] Comp, RE 1, ¶ 33. **Note:** Defendant VanSingel does not dispute that she "lured" Plaintiff to her apartment, with the intention of "confronting him over his conduct with Sepeczi and Bookie[.]" VanSingel Answer, RE 8, ¶¶ 33, 48

[71] Comp, RE 1, ¶ 40; **Ex B; Ex C.**

[72] **Ex B, Ex C.**

[73] Comp, RE 1, ¶ 33.

**d. Intentional Infliction of Emotional Distress.**

In Michigan, one prevails on a claim for Intentional Infliction of Emotional Distress ("IIED") when he can prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.[74]

As to the first element, whether conduct is extreme and outrageous is, generally, a question for the finder of fact and therefore is inappropriate for judgment as a matter of law.[75] In *Lineburgh,*[76] the defendant had drawn a racy cartoon of the plaintiff having sex not with her husband but with a coworker. And in *McCahill*, the defendant insurance adjuster had incorrectly asserted that the plaintiff had, among other things, engaged in "the crimes of arson, false swearing, and fraud."[77] In both cases, the Michigan Court of Appeals concluded that the trial court properly entrusted the question of whether the complained of conduct was "extreme and outrageous" to the jury. In the case at bar, the Defendants published a video falsely accusing Plaintiff of being a "whore" because he was dating all of them at the same time. *Lineburgh* tells us that a false allegation of sexual infidelity may amount to extreme and outrageous conduct. And *McCahill* tells us that defamation per se, in that case accusations of criminal behavior, may also count. The courts of the state of Michigan would likely find that the Defendants' conduct was "extreme and outrageous," sufficient to avoid summary disposition.

As to the third and fourth elements, "causation" and "severe emotional distress," the Michigan Court of Appeals has told us that "we do not believe that seeking and receiving medical treatment is a condition precedent to satisfying the element of extreme emotional distress."[78] That

---

[74] *Linebaugh v Sheraton Michigan Corp,* 198 Mich App 335, 342–43 (1993)
[75] *Id* (jury could decide whether complained of conduct was "extreme and outrageous")*, see also McCahill v Commercial Union Ins Co,* 179 Mich App 761, 769–72 (1989) (same).
[76] 198 Mich App at 342–43
[77] 179 Mich App at 769-72.
[78] *Id.* at 772.

said, Plaintiff has been diagnosed with adjustment disorder with mixed anxiety and depressed mood, which is code F43.23 in the DSM-5.[79] This diagnosis is characterized by development of clinically significant emotional symptoms in response to an identifiable stressor, occurring within 3 months and causing impairment in functioning.[80] This was caused by the August 17, 2025 events.[81] Plaintiff's medical records substantiate his allegations that this is so.[82] The elements of extreme emotional distress, and causation, are established.

Finally, as to the third element, "intent or recklessness," Plaintiff has alleged that "all of this [the August 17th actions described herein] was done with the purpose and intent of causing Plaintiff extreme emotional distress and permanent damage to his reputation."[83] Indeed, the video was posted with "#hashtag" markings including "#alexminnehan" and "#calvinuniversity" that, as Plaintiff correctly alleged, "would cause this video to be shown to persons at Plaintiffs home city and college" and "[a]ll of this was intended to cause maximum adverse impact to Plaintiff's reputation and emotional state."[84] The Defendants acted with intent to cause Mr. Minnehan sever emotional distress. Their conduct was, at very least, reckless.

It can reasonably be inferred, given the circumstances, acts, and conduct of VanSingel, Sepeczi, and Bookie that they coordinated together to cause Plaintiff significant emotional distress. As more fully laid out herein and throughout the pleadings and discussed herein, "Defendants conspired together to lure Plaintiff to VanSingel's apartment under false pretenses, ambushed him with a video recorder, falsely accused him of being a 'whore' and a 'slut,' falsely imprisoned him,

---

[79] Comp, RE 1, ¶ 33.
[80] *Id.*
[81] *Id.*
[82] **Ex. A.**
[83] Comp, RE 1, ¶ 58.
[84] *Id.* at ¶ 23

and then proceeded to post the video of this online for the world to see."[85] Causing him extreme and emotional distress was, at very least, the natural and probable result of their actions.

**CONCLUSION**

For the reasons stated herein, Plaintiff prays this Honorable Court DENY Defendant Bookie's Motion to Dismiss in its entirety and permit this claim to proceed to discovery.

Respectfully Submitted,

Dated: 9/21/2026

_*/s/ Collin H. Nyeholt*________

Collin H. Nyeholt (P74132)
LAW OFFICES OF CASEY D. CONKLIN, PLC
*Attorney for the Plaintiff*
4780 Okemos Road, Suite 2
Okemos, MI 48864
(517) 522-2550

[85] *Id.* at ¶ 57.

**Certificate of Compliance Regarding Word Count**

I, the undersigned, do hereby affirm that the attached brief complies with L.Civ.R. 7.2(b)(i) because the brief, including headings, footnotes, citations and quotations, contains 5,138 words according to Microsoft Word 365, the word processing software used to create it.

Dated: 9/21/2026

*/s/ Collin H. Nyeholt*

Collin H. Nyeholt (P74132)
LAW OFFICES OF CASEY D. CONKLIN, PLC
*Attorney for the Plaintiff*
4780 Okemos Road, Suite 2
Okemos, MI 48864
(517) 522-2550